| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | ELECTRONIC PUBLICATION ONLY |
|---|---|

| UNITED STATES OF AMERICA<br><br>- versus -<br><br>WILLIE ZIMMERMAN,<br>                       Defendant. | STATEMENT OF REASONS<br><br>10-CR-598 (JG) |
|---|---|

JOHN GLEESON, United States District Judge:

On November 22, 2011, I sentenced Willie Zimmerman to time-served (19 days in custody) and a three-year term of supervised release after his conviction, pursuant to a guilty plea, of a single count of distribution of crack cocaine in violation of 21 U.S.C. §§ 841(a) & 841(b)(1)(C). This sentence was a substantial variance from the applicable range calculated pursuant to the advisory United States Sentencing Guidelines, which was approximately four to five years in prison. I explained the reasons for the sentence at the time it was imposed, and I elaborate upon them here.

A.    *The Offense*

The case against Willie Zimmerman arose out of a two-year investigation by the Federal Bureau of Investigations into narcotics trafficking in the Bedford-Stuyvesant section of Brooklyn. On five occasions, Zimmerman sold a total of 35.3 grams of crack cocaine to a person who was cooperating with the investigation.[1] He was not involved in any violence.

---

[1] Specifically, on March 4, 2008, Zimmerman sold 9 grams of crack for $600 inside 390 Gates Avenue; on March 12, 2008, he sold 5.3 grams for $360 near Bedford Avenue and Gates Avenue; on April 2, 2008, he sold 8.6 grams for $600 inside 390 Gates Avenue; on June 19, 2008, he sold 9.3 grams for $600 inside 390 Gates Avenue; and on September 10, 2009, Zimmerman sold the cooperating source 3.1 grams of crack for $150.

Zimmerman was arrested on July 1, 2010. He pled guilty on October 6, 2010, to distributing crack cocaine. His advisory Guidelines range was 46–57 months.

B.   *Zimmerman's History*

Zimmerman is now 25 years old. He was 21 years old at the time of the first crack transaction charged in the case, and had turned 23 by the time of the last one. He has lived all his life at the same address in the Bedford-Stuyvesant section of Brooklyn. His father, a maintenance worker, died when Zimmerman was 10 years old. He and his sister, who is now 28, were raised after that by their mother, and still live with her. The mother, now a cook at a public school in Brooklyn, struggled financially but provided for her children.

After his father's death, Zimmerman had problems with discipline in school. The school authorities referred him to a psychologist, who Zimmerman visited regularly for about two years.

Beginning at age 12 and lasting until his arrest in this case in 2010, Zimmerman smoked marijuana on and off. By age 17, he smoked it five or six times per day. He experimented with other drugs, including phencyclidine ("PCP"), ecstasy, heroin and cocaine. At the time of his arrest in this case, he drank from half a pint to a pint of cognac daily.

The discipline problems that began when his father died continued, and Zimmerman was expelled from Boys and Girls High School. Raised as a member of the local Baptist church, he left the church and began hanging out in the streets. To earn money, he began the street-level drug dealing that got him arrested in this case.

C.   *The First Adjournment of Sentence*

Defendants are almost always on their best behavior between pleading guilty and getting sentenced. So it was no surprise to me that Zimmerman, who was fortunate enough to make bail less than three weeks after his arrest, returned to his church and began taking classes toward

receiving his GED in the run-up to his original sentencing date. Nonetheless, a letter I received from his pastor, which remarked not only on Zimmerman's reinstatement as a church member but also on a newly-demonstrated humility and self-awareness, suggested genuine promise in him. There were other indicia that Zimmerman, who has very strong family support from his mother and sister, was maturing. Through the church, for example, he was speaking to young children, urging them to stay in school. His sister became pregnant, and Zimmerman realized she would need his help because the father of her child is serving a long prison term in an upstate prison.

The case was first called for sentencing on February 11, 2011. Defense counsel's sentencing submission requested a 46-month term of incarceration, *i.e.*, a sentence at the bottom of the advisory range. It emphasized the positive signs discussed above, and quoted the pastor's statement that "[t]here is great potential in this young man who realizes he has made mistakes."

Crack has been the scourge of many of our city's neighborhoods for a quarter-century. Selling it is a serious crime, and for all of those 25 years the principal currency of punishment in our system has been years in prison. As a result, even after Congress blunted the infamous 100:1 ratio (which punished offenses involving a single gram of crack the same as offenses involving 100 grams of powder cocaine), Zimmerman still faced an advisory prison range of approximately four to five years for selling less than an ounce and a half of crack.

On the other hand, Zimmerman was showing a spark of hope that a four-year prison term would threaten to snuff out. His lawyer wrote that Zimmerman had "a biography that Your Honor and I have heard too often. Another young man seemingly doomed to end up in prison." There was a palpable risk that sending him to prison for 46 months would simply start a cycle of incarceration and release that would repeat itself throughout Zimmerman's adult life.

3

Rather than sentence Zimmerman on February 11, 2011, I asked him if he wanted a chance to earn an opportunity for leniency by participating in this district's Special Options Service ("SOS") Program. Set forth below is our Pretrial Services Agency's description of that program:

> **Program Eligibility:** Primarily designed to work with non-violent juvenile and young adult defendants up to the age of twenty-four; special consideration may be made for older individuals on a case by case basis. Defendants cannot have a violent criminal history or lengthy criminal record. Appropriate candidates may have an existence of significant childhood trauma (rape, molestation, child abuse, loss of a parent, drug or mental health issues, etc.). Individuals are not cited as a danger to the community, and must be willing to participate in the program and abide by the conditions imposed.
>
> **Services Provided:** Educational and Vocational referrals, Mental Health and Drug treatment referrals. Individual meetings with defendants at least once weekly to discuss and promote life skills such as: setting and attaining short terms goals, health & hygiene, stress management, and the defendant's progress in educational or vocational programs. Defendants are also required to abide by a curfew as set by Pretrial Services in an effort to reduce the risk of further criminal activity.
>
> **How The Program Works:** Generally at the first meeting between the Pretrial Services Officer and the defendant, a determination as to the needs of the defendant is ascertained. Along with those determined needs combined with the personal interests of the defendant, appropriate programs are designed to help participants attain goals that have been set jointly by the defendant and the Pretrial Services Officer.

Zimmerman wanted the opportunity, and Amina Adossa-Ali, the Pretrial Services Officer who runs the SOS Program, agreed to supervise him.

D.    *Zimmerman's Supervision in the SOS Program*

There ensued more than nine months of intensive supervision by Officer Adossa-Ali. I have reviewed her weekly reports, which occupy 19 single-spaced typewritten pages, and set forth only some of the salient events here.

- February 15, 2011 — Zimmerman was told he would have to work on the skills he needs to work legally and live a law-abiding life style. He was further told that each week he would be given tasks and goals and be expected to work towards them. If the tasks were not completed on time, he would have to report as many times in the following week as it took to complete them, or until Officer Adossa-Ali concluded that a good faith effort had been made. Zimmerman was given applications for renewal of his New York State identification card, his Social Security card, and his birth certificate, and was told to have them completed within three days. He was further instructed to contact Medicaid to reactivate his Medicaid card.

- February 22, 2011 — Officer Adossa-Ali referred Zimmerman to the HOPE Program here in Brooklyn, an intensive job readiness program. Since Zimmerman had never had gainful legal employment, if accepted, he would learn how to prepare a resume and cover letter, select proper interview attire, and obtain interviewing and other skills he would need to have a legitimate career. Zimmerman was told that attendance, punctuality, and compliance with the rules of the HOPE Program are closely monitored and strictly enforced.

- March 15, 2011 — Zimmerman, who had been accepted into the HOPE Program, reported that he was finding it useful and informative. He was learning a lot about himself and his abilities and how to be more patient.

- March 22, 2011 — Zimmerman advised Officer Adossa-Ali that he was participating as required in a GED class. Zimmerman spoke at length about how his attitude was changing and he appreciated being given the chance to make those changes. Specifically, he found himself becoming friendly with some people at the HOPE Program who he never thought he'd even acknowledge with a "hello". Officer Adossa-Ali told him this would serve him well when he got a job because, in the legitimate world, you encounter people you don't like but it's important not to fight or argue and to keep on moving ahead. "Mr. Zimmerman indicated that he is

certainly not there yet, but hopes he finds his way to that place," the officer noted.

- March 29, 2011 — Zimmerman reported completing half of a 10-hour OSHA training course. He was also taking an on-line food-preparer licensing course.

- April 12, 2011 — Zimmerman reported that he had been taking the practice GED test and hoped to be ready to take the exam soon. He was scheduled for mock job interviews the coming week in the HOPE Program, and Zimmerman acknowledged that learning how to relate to strangers would be a difficult task for him. Officer Adossa-Ali informed him that the purpose of the mock interviews was to enable him to make his mistakes in that setting, and to learn how to correct them.

- April 19, 2011 — Zimmerman reported that he had an interview for an internship at a compact disk company the coming week. He also asked permission to attend Good Friday services at his church.

- April 26, 2011 — Zimmerman reported that the job interview went well and he was beginning an internship that day. His GED classes would continue.

- May 3, 2011 — Zimmerman reported that the internship was slow (due to the sagging compact disc business) and unchallenging, but he would stick with it until he could find something better.

- May 17, 2011 — Zimmerman reported that he was placed in a different internship by the HOPE Program, and that he would soon be taking the GED exam at HOPE.

- June 7, 2011 — Zimmerman reported that he was interning at Catholic Charities but had an interview for a job as a polisher/assembler.

- June 14, 2011 — Zimmerman reported that he had advanced in all the GED subjects except Math, which he continued to work on in classes at the HOPE Program. His interview for the job went well, and he was trained for four hours, but he was still waiting to hear if he got it.

- June 21, 2011 — Zimmerman reported that his GED exam was scheduled for July 29 and 30. He also presented his safety card from OSHA, which, as a non-union member, he would need in order to work on union construction jobs.

- June 28, 2011 — Zimmerman reported that he continued at his internship and also was looking for another job.

- July 5, 2011 — Zimmerman reported that he was continuing to look for paid work on his own and with the help of the HOPE Program, and, that he would complete that internship soon.

- July 19, 2011 — Zimmerman reported that he unsuccessfully interviewed for a job at a lighting company, and further reported his frustration at not having gotten any job he had interviewed for. Officer Adossa-Ali told him he is still "rough around the edges," and his refusal to smile or show emotion may be affecting the interviewers. Zimmerman said he was working on being friendlier to strangers, but it didn't come naturally. He was advised to work with the people at HOPE on interviewing skills.

- July 26, 2011 — The internship had been extended. The GED exam is in three days. Zimmerman asked for and was given instructions about notifying Pretrial Services of his whereabouts if his sister goes into labor.

- August 2, 2011 — Zimmerman reported interviewing unsuccessfully for a position at Ikea. He reported confidence regarding the GED exam, but won't learn the results for six weeks.

As the foregoing shows, Zimmerman had made significant progress in his rehabilitation in the first year after his arrest. He had taken the GED exam, received job training, held down an internship and was interviewing for paid employment. He had also stopped using drugs and was gaining a more positive attitude.

E.    *The Second Adjournment of Sentence*

On August 5, 2011, Zimmerman again appeared sentencing, but I again decided not to impose sentence. I had gotten a report from Officer Adossa-Ali that Zimmerman appeared to have learned a lot about himself, was more trusting of the positive influences SOS supervision had exposed him to, and had learned how to accept criticism, think positively, and plan constructively for his future. According to the officer, however, Zimmerman was still a work in progress, and he needed to be more proactive and independent in searching for employment. I

adjourned sentence because, as I mentioned to Zimmerman at the time, I wanted to "give [him] a chance to prove that even though [his] guidelines [were] four to five years, jail [wasn't] the right outcome for [him]." August 5, 2011 Tr. at 3–4.

F.  *The Continued Intensive Supervision; Zimmerman Gets the First Legitimate Job of His Life*

The subsequent supervision notes include the following:

- August 9, 2011 — Zimmerman thanked Officer Adossa-Ali for her assistance. He stated that he never felt insulted when she pointed out weaknesses or told him he was not showing as much effort as he could. He stated that in the past he may have been insulted and "just shut down" in those circumstances. Officer Adossa-Ali suggested that the reason for the change may have been that he was maturing and progressing, but the true test of that would be how he used his newfound skills and patience when this case is over.

- August 16, 2011 — Zimmerman reported filling out applications for jobs at Walgreens and Costco, and that he was attending an orientation to a cabinet-making training program the following day.

- August 23, 2011 — Zimmerman reported that his sister had her baby. He provided his employment action plan for the week; he had the cabinet-making orientation and was waiting to see if he had been accepted into the program.

- August 30, 2011 — Zimmerman reported that he went to several businesses on his own seeking employment during the prior week. He was told either that there were no positions available or that the managers were on vacation; he would be returning to two of them in the upcoming week.

- September 13, 2011 — Zimmerman reported that it remained true that every interview had been unsuccessful, and he was discouraged, but he would keep at it. He had applied for a position as a dishwasher. Officer Adossa-Ali informed him that he was not the only person having a hard time finding a job in the down economy and he needed to keep on trying. Zimmerman stated that he would not lose his drive.

- September 20, 2011 — Officer Adossa-Ali told Zimmerman that he did not appear to be showing the effort he could show, and she

8

wanted to see verification of his efforts. Zimmerman stated that he was struggling with all the rejections or non-responses he had received from the many jobs he had applied for, and he was trying to keep a positive attitude but was getting increasingly frustrated. Officer Adossa-Ali told him he had no time to feel sorry for himself and must report to HOPE the following day for information about a job interview.

- September 27, 2011 — Zimmerman reported that he had to complete training for the dishwasher position, and if all goes well he may get it.

- October 4, 2011 — Zimmerman had called during the week to report getting the dishwasher job, his first legitimate employment of his life. His first paycheck would come on October 18, 2011. He reported that the job is not great but he had his eyes on a better position – as a porter – in the same workplace.

- October 18, 2011 — Zimmerman reported that work was going well and he felt good having something to do each day.

- October 25, 2011 — Zimmerman reported that he had found his niche and is looking forward to moving forward as a porter.

- November 1, 2011 — Zimmerman reported that he continued to work and to wait for a porter position to open up. He verified his employment with a copy of his pay stub.

- November 8, 2011 — The porter position still hadn't opened up, Zimmerman reported. He didn't like the dishwasher position any more than when he started, but he was trying not to quit in hopes that he could land the porter job. Officer Adossa-Ali told him not to quit the job he has unless he had already lined up another.

By the fall of 2011, Zimmerman, at age 25, had obtained the first legitimate employment of his life. He did so by persisting in the face of repeated rejections. And although his new job required hard work, Zimmerman was willing to stick with it.

G. *The Sentencing*

Zimmerman appeared for sentencing on November 22, 2011. I imposed a sentence of incarceration equal to the amount of time he'd already served in the case (19 days) to be

9

followed by a three-year term of supervised release. The special conditions of supervised release include drug treatment as directed by his supervising officer and that Zimmerman maintain his employment. In addition, I meet with Zimmerman and his supervising officer monthly to monitor his supervision.

H.    *The Reasons for the Sentence*

Despite the seriousness of Zimmerman's criminal activity, and even though every sentence must take that factor into account, there were a number of reasons not to send Zimmerman to prison.

   1.    *Alternatives to Incarceration Are Punishment*

First, the sentence imposed punishes Zimmerman. Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty. *See Gall v. United States*, 552 U.S. 38, 48–49 (2007). Offenders on supervised release, like the probationer in *Gall*, "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Id.* at 48. Imprisonment is concededly a more onerous form of punishment, and different in kind from supervision, but Zimmerman is being punished.

   2.    *Post-Arrest Rehabilitation*

Second, Zimmerman's post-arrest rehabilitation warrants a more lenient sentence than incarceration. Even in the mandatory-Guidelines era, post-arrest rehabilitation was a valid ground for a departure from the otherwise applicable Guidelines range. *See United States v.*

*Maier*, 975 F.2d 944, 946–48 (2d Cir. 1992); *see also United States v. Core*, 125 F.3d 74, 77 (2d Cir. 1997); *United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995). These decisions recognized that a defendant's "awareness of [his] circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society" could warrant a downward departure. *Maier*, 975 F.2d at 948. Now that the Guidelines are advisory, there can be no doubt that a defendant's post-arrest rehabilitation is a factor on which a sentencing court may properly rely. *Cf. Pepper v. United States*, 131 S. Ct. 1229, 1236 (2011) ("We hold that when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range.").

Post-arrest rehabilitation is highly relevant to several of the factors a sentencing court is required to consider when imposing sentence. *See id.* at 1242; *see also* 18 U.S.C. § 3553(a) (listing factors a court must consider when imposing sentence). First, post-arrest conduct "constitutes a critical part of the 'history and characteristics' of a defendant that Congress intended sentencing courts to consider." *Pepper*, 131 S. Ct. at 1242 (quoting § 3553(a)(1)). Second, this conduct "sheds light on the likelihood that [the defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." *Id.*; *see also* § 3553(a)(2)(B)–(C); *Williams*, 65 F.3d at 308. Third, a defendant's efforts and attitude toward rehabilitation will necessarily inform the sentencing court's duty to "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." § 3553(a)(2)(D); *see also Pepper*, 131 S. Ct at 1242. Finally, a defendant's post-arrest rehabilitation "bears directly on the District Court's overarching duty to

'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing." *Pepper*, 131 S. Ct at 1243 (quoting § 3553(a)).

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000); *see also Pepper*, 131 S. Ct. at 1242. When Zimmerman stood before me on November 22, 2011, to be sentenced, he was in many ways a different person than the one who had sold crack a few years before. Zimmerman's efforts at rehabilitation have been commendable. He remains a work in progress, but SOS supervision required Zimmerman, who had a very difficult start in life, to learn the basic skills needed to live a law-abiding life. Zimmerman seized that opportunity. He altered the negative and self-defeating attitude he brought into the SOS Program, worked very hard, got his GED and landed the first legitimate job of his life. He has also remained drug free. His history and characteristics support a lower sentence than one within the advisory Guidelines range.

Zimmerman's willingness and ability to hold down a legitimate job also make him less likely to commit crimes in the future. Zimmerman sold drugs because he believed it was the only way he could make money. Given his lack of experience and education, his regular substance abuse and his poor attitude, he may very well have been right. But thanks to his efforts through the SOS Program, that is no longer the case. A prison sentence is therefore not necessary to protect the public from future crimes or to deter Zimmerman from engaging in future criminal conduct.

In my view, even taking into account the seriousness of Zimmerman's offense, imposing a more onerous form of punishment – that is, a period of years or even months in prison – would pose an undue risk of wiping all of Zimmerman's hard work away, disserving not only him and his family but the community as well. A sentence of supervised release will allow Zimmerman

to continue down the positive path he is on. It strikes me as counter-productive to remove Zimmerman from his current circumstances and delay his further progress while he sits in prison for nearly four years (the low end of his Guidelines range). Just as Zimmerman is not the same person today as when he sold crack, he would not likely be the same person after such a lengthy term of imprisonment as he is today. He could easily lose the positive attitude he currently has and fall back on old bad habits.

A sentencing court can and should impose a sentence that not only takes into account past rehabilitation, but facilitates further rehabilitation. In *Williams*, for example, the Second Circuit upheld a downward departure from the then-mandatory Guidelines range for the express purpose of allowing the defendant to enter the Bureau of Prison's drug-treatment program. *See Williams*, 65 F.3d at 306. A within-Guidelines sentence would have forced the defendant "to wait some six or seven years to begin treatment." *Id.* If the defendant's "resolve weakened under the pressures of prison life, the chance of curing him of his addiction and perhaps his criminal ways would vanish." *Id.* Recognizing that the defendant faced "a limited window of opportunity for rehabilitation," *id.* at 307, the court affirmed the downward departure.[2]

The same is true here. A term of continuing supervision will allow Zimmerman to continue on the path the SOS Program started him on. A term of imprisonment would needlessly delay his rehabilitation and potentially erase the significant gains he has made.

Zimmerman has demonstrated that he deserves an opportunity to show that he can continue to live the law-abiding and productive life the SOS Program prepared him for. But he retains the burden of following through on this opportunity. Zimmerman knows that if he

---

[2] The Second Circuit upheld the downward departure only on the condition that the sentencing court add two special conditions of supervised release: First, that the defendant present certification at the commencement of his supervised release term that he had remained in the treatment program until its completion or his release from incarceration; and second, that during his supervision he submit to drug testing and receive further drug treatment if directed by his probation officer. *See Williams*, 65 F.3d at 309.

violates the conditions of his supervised release he will likely go to prison. The sentence therefore includes a meaningful insurance policy if he wastes the chance he has been given.

I.  *Conclusion*

Zimmerman committed a serious crime, which could easily have resulted in a substantial term of imprisonment. But, through the SOS Program, Zimmerman has demonstrated that he is ready to turn his life around and he deserves an opportunity to do so. A sentence of time served and three years of supervised release gives him that opportunity and is the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a).

John Gleeson, U.S.D.J.

Dated: June 19, 2012
      Brooklyn, New York